May it please the Court, my name is Peter Perlman and with my colleague and friend Scott Fisher I am pleased to represent Halpert Enterprises Inc. before this Court this morning. I would like to reserve three minutes of my time for rebuttal if I may, Your Honors. This is the second appeal from denial of a application to amend this shareholders derivative action under Rule 15a as the Court is aware that is leave which is generally freely given. In this particular case the District Court has decided now twice not to permit amendment this time on the grounds of the standard we set in Merck 1. In Merck 1, that's correct. The Court determined that we had not pled what the Court said in Merck 1 we were supposed to plead. That is that the directors face a substantial risk of liability because they deliberately or recklessly ignored a well-established link between Vioxx and cardiovascular risk. We believe that that's not correct. We believe that the finding below was based upon and focusing on statements of very few statements that were pulled selectively out of basically two articles which were taken out of context ignoring contrary information and we are entitled to the benefit of the contrary information from a host of articles which were cited and allegations which were made in a very lengthy and the Court found I think well-pleaded complaint where our inferences, the inferences that we sought to have drawn were not only reasonable, but I suggest to this Court mandatory. We believe that the Court below simply either misconstrued or misapplied the 12b-6 standard, which accords us the benefit of whether under any reasonable construction of the facts as pled we could be found to be entitled to relief. But if there's a dispute about the issue of the effect of Vioxx on coagulability of blood, isn't that something that the directors can consider and the fact that there is a dispute, they don't necessarily have to decide the dispute, they aren't qualified to decide the dispute, but the existence of a having to take action either one way or the other way. In this particular, the answer is if there were a good-faith dispute, if it were totally unclear, if the naproxen conjecture, I think they call it the naproxen hypothesis, that Merck pinned its entire refusal to come out and pull this drug or give warnings about this drug on, had a decent scientific basis. I suggest that because of the mountain of evidence that was out there that this drug was really killing people, the Board would have had a responsibility to do something, to get some testing done about it, because there was no testing done. There was no testing done to confirm this naproxen hypothesis in spite of the fact that a legion of people from the FDA to the FDA had a responsibility, maybe, that there was some naproxen-related result here were saying to Merck, will you please test for this, because we don't know. But that's not what happened here. I didn't mean to interrupt you, Judge Goodis, I'm sorry. That's not what happened here, though. Well, I don't know. You're not suggesting that the information that the Board was receiving was entirely one-sided, are you? I am suggesting that the information that the Board was receiving was entirely one-sided. But the Board was reaching out for help, and it received help from management individuals who presented certain profiles to the Board that neutralized the scientific evidence that was being presented. I say neutralized, but they were getting two different versions. So I don't think that it was entirely clear early on that Vioxx was as dangerous as some of the scientific studies suggested. In other words, they were getting two sides, and they had to make certain judgments, did they not? At a point, perhaps they had to make certain judgments. Does it matter when, does timing matter here? The district court actually cited fairly early, three fairly early reports, and did not cite later ones where it seems that things shifted a little. Does the timing matter here? The timing does matter, because we are alleging that during the entire, we allege that during an entire period of time, commencing essentially with the Igor study, and going through the time that Vioxx was finally pulled, I guess four or five years later, was finally pulled off the market, that the Board knew and had reason to believe and should have acted. But you're right, Judge Rendell, the evidence continued to mount over that time. And I do disagree, and it got to a point finally, in relatively early on, in September of 2001, where the their statements, the statements that that Board kept making, reconfirming the safety profile of Vioxx, were deceptive, and that they were, quote, and this is the FDA speaking to Merck, simply incredible that you can reconfirm it. Incomprehensible. I'm sorry, simply incomprehensible. You're right, I can't read my own notes. I'm sorry, Judge Rendell. Wasn't it about that time that Merck approved the, approved e-study in order to study the cardiovascular risk that Vioxx posed? I don't think that they ever did that. They never approved a study to study the  I didn't say approve, I meant approve. They never approved a study for cardiovascular efficacy of this, and to the extent they did, they had no business telling the public that this drug was absolutely safe. By the way, in that same letter where the FDA called Merck's statements that Vioxx was safe, simply incomprehensible, they also said that this naproxen hypothesis that Vioxx, that Merck was basing its entire defense on, was unsupported by any scientific evidence, and that's something that the company was told, and that the board was told, time and again was the case. They were told that from the earliest time. They were told that in the Petrano article in March of 2000. They were told that by Skolnick, Skolnick in the various emails, a member of the board at that time, in various emails that we presented, has said that he conceded that there was no scientific basis for it, that the mechanism, the cardiovascular mechanism was, that the cardiovascular problems were mechanism-based as we were concerned that it would be. He came back later saying that the prostacyclin hypothesis, which is that Vioxx was causing the problems, is further strengthened by Vigor, and that we can't tell if there is any naproxen-related cardioprotective effect without testing, and that testing was never done. I mean, they concede all these things, and Judge Fuentes, in response to your request, or in response to your question earlier, we are entitled to the inferences to be drawn from this. We are entitled to our version of the facts, and we are entitled to have the court believe that what we are saying the board knew, and what we are saying the board saw, particularly where there is evidence to show that, is correct, because that's the 12b6 standard. This court cannot, and the district court should not have, sat down and said, well, you know, I look at this, and I look at that, and I think perhaps I might draw a contrary inference. That's not right. Under 12b6, we are entitled to the inference. We are entitled to the inference that the board knew all these things, that the board saw all these things. This same district court. But you want us to presume that the entire board was new. In other words, that it had knowledge that all of these scientific studies were bringing into serious question the health benefits of Vioxx, and in fact were pointing out to the dangers of the drug. I do want you to assume that, Your Honor, and I want you to assume that for a very good reason. I want this court to assume that because the court has found it to be true, the defendants conceded it to be true, and the law presumes it to be true. The court, in the opinion below, said that the complaint had plagued with specificity detailed information about what the board knew, and that this sophisticated, and I'm using the word sophisticated, although I think it's clear the board was very sophisticated, sophisticated board received the test results, and in fact, the court held, and the defendants conceded at page 8 of their brief, that the board was informed about the results of the Vioxx research, all major scientific and regulatory developments with respect to Vioxx. What do you suggest that the board should have done? I mean, do you suggest that the board should have stopped promoting the use of Vioxx, should have suspended or voted to suspend its use? They apparently didn't take any vote one way or the other. You certainly haven't pointed to one. The only vote that the board took with respect to Vioxx during this entire period of time were a series of votes to vastly increase the marketing of Vioxx, to spend more and more money on Vioxx, marketing it, to expand it to a larger population, to try and get approval to use it in Japan as time went on. Those are the only votes that the board took, and what I'm suggesting that the board should have done is several things. They had several options. Number one, they could have demanded the test. They could have said, everyone here is telling us to go out and test. Test this stuff, please. And by the way, people are dying as a result of the use of this stuff. Now, it's possible... Let me ask a question. You're talking about what they should have done. Is that really at issue here? We're talking about futility of making a demand, which is a very threshold issue. Aren't we looking at whether, you know, if you're sitting in the seat of one of the directors, kind of the cloud goes over your head that says, oh my god, I got a problem here. Yeah. Because what if? I mean, isn't that really what we're talking about? And whereas we have put a very pretty heavy burden on that, we're still talking about a link with respect to a risk, and it's all about risk, and whether the directors knew that there was such a risk that they could be sued. That's the basis for the whole futility, isn't it? Yes. Do we need concern ourselves with, you know, what they should have done? Isn't it the fact that they sat there and listened to this, and listened to marketing, you know, that maybe wasn't totally going to be totally forthright, that the director, you know, the oh-my-god factor is really what we're talking about? I mean, it has to be a definite that you couldn't be around that table without saying, oh my god. You couldn't be around that. You're right, Judge Rundell. I was trying to respond to Judge Fuentes' question. I'm just trying to figure where we are with the issue that really is before us, which is a very threshold. Yes. Are we gonna allow this even to sit here because it would be futile to make a demand? I agree, and by the way, the same district court that threw us out because they said that we simply hadn't shown that there was any probability that we hadn't even raised, and the legal standard is a reasonable doubt that the board was disinterested or independent. We only have to raise a reasonable doubt. We don't have to prove by a preponderance of the evidence. If we hadn't, the same district judge, I'm sorry, Judge Fuentes. Why don't you take that pitch that was just thrown to you and tell us why it would have been futile to make the demand on this particular board? It would have been futile to make the demand on this particular board because this particular board, by their conduct, is liable for the conduct of Murphy. If they had acted, they would have feared, or they couldn't act because they feared being sued. Yes, correct. They could not act with respect to a demand because they would have feared being sued, if that's the actor talking about. Yes, they could not have acted with respect to a demand, could not be expected to act disinterestedly with respect to a demand. Because they feared they could be held liable. Yes, that's exactly right, and as we said in our brief, and as the district court had said, and this is very early on in the period that we're talking about, by October 9th, 2001, three years before Vioxx was pulled, an overwhelming collection of information signaling deceit by Merck with respect to the safety of Vioxx had accumulated in the public realm. Now, for the directors, the sophisticated board to sit back and say, well, you know, gee, we couldn't have known anything about it, didn't know anything about it. For the district court to say that you haven't raised a reasonable inference here, that you haven't created a reasonable doubt that these directors might be liable for not doing something about, not seeing, and not focusing on something that was clear to everyone else in the district. Counsel, your light is on. Let me ask a question. The Merck case that we decided that is on appeal to the Supreme Court with respect to the storm warnings issue, would that, the result in the Supreme Court, if there were a reversal, would that impact you? I don't think it would, no. I know my time is up, but I'd like to give you the why, because I think that's the next logical, the next logical question. Because the issue here is what the board reasonably should have known and what was before the board. I'm sorry? As opposed to what the public knew. Yes, yes. And clearly, the board was a little more, a little more on the in here than the public was. We know, because the law presumes that Skolnick and Gilmartin told the board what they knew, they didn't necessarily tell the public. And you filed within the statute. Oh, yes. All right. Yes. Thank you. We'll hear from you on rebuttal. Let me start with the question of what the board knew, because the last thing that opposing counsel said is not supported by any law. The law does not presume that every member of the Board of Directors knows what every other member of the Board of Directors knows. But isn't that something that would be, if a case like this went to trial, then who exactly knew what would be developed at the trial? But to get enough allegations to go to trial, isn't it sufficient to show in general what information was provided to the board that might put them in fear of not wanting to respond to a stockholder demand because of what they knew or should have known at the time? Well, what the case law says, what the Merck One Third Circuit panel said, and it was following the Delaware Supreme Court cases on this, is that the standard is very high and very clear. The facts, the particularized facts, need to show that a here are outside directors, they're not management directors, knew that Vioxx caused cardiovascular harm. That is not an overstatement, it is not loose language. The language of the Delaware Supreme Court case says where there's an exculpatory charter provision, as there is in this case, a plaintiff must plead particularized facts that demonstrate that the directors had actual or the plaintiff has to plead particularized facts, not that show that there was a debate, not that show that there was cause for concern, not that show that there was notice of a problem or a risk. They have to show intentional failure to act in the face of a known duty to act. The language, the literal words of the Third Circuit One decision are correct. They had to show by particularized, pleaded facts that the Board of Directors knew the answer to a question that was, at that time, unanswered in the scientific community. Well, you say it was unanswered, but where was the scientific evidence that this naproxen hypothesis had any... Let me respond directly. It's clear, is it not, that the two drugs, the impact of the P drug and the T, the P and the T, the impact was on clotting such that there were, you know, there was scientific evidence that there was that link. So if there's scientific evidence, there's a link here, no scientific evidence that this does anything, then where does that take you? Actually, Your Honor, the Merck directors were presented with multiple studies showing that in all comparisons of Vioxx with placebo, as distinct from comparisons of Vioxx with naproxen, Vioxx did not cause any increase in cardiovascular events. Those studies were reviewed in detail with the board. There are slides in the appendices that have been furnished to the court. Plaintiff's counsel made reference to the FDA letter. The FDA sent a very harsh, very strongly worded letter saying to the world that the answer is naproxen. And what they say, and I'm quoting, is that is a possible explanation, but you fail to disclose that it's hypothetical, and there is another reasonable explanation. That's in September of 2001. What the board knew about that letter, what the board also knows is that over the ensuing six months, Merck scientists and FDA scientists and the medical community are debating this. And what is the conclusion of that debate? In April of 2002, Merck not only has to deal with the labeling dispute and the issues raised in the FDA warning letter, but Merck has in fact asked for an expansion of the indications for which it's permitted to market Vioxx. The FDA not only grants those indications, but it sends a letter to Merck saying we have completed the review of these supplemental applications as amended, and we have concluded that adequate information has been presented to demonstrate that the drug products are safe and effective for use as recommended in the agreed upon enclosed labeling text. I'm not sure how to evaluate that comment by the FDA in light of the drumroll of reports that seem to suggest that Vioxx clearly pose a cardiovascular risk. Beginning with the Vigor study, going on to the Advantage study, the Welton study, the New York Times article, the FDA letter, the Harvard study, the Vanderbilt study, all of them seem to suggest, and it was a drumroll of reports and studies, that Vioxx posed a cardiovascular risk. There were also contrary studies. Those studies were presented to the board of directors. They were reviewed by the top scientists at Merck, including Dr. Skolnick, who himself had been a board member, and by Dr. Skolnick himself acceded that the effect of Vioxx should be investigated, and that naproxen was not necessarily the element that promoted a good result as opposed to Vioxx leading to a bad result. Dr. Skolnick conceded it is true. In the fall of 2001, Dr. Skolnick said, yes, it could be either one. We don't know, and we're continuing to investigate. And in fact, with respect to the statement that there was no test, there were continued tests, and the board was informed that Merck was continuing to perform tests. And when the Harvard study came out in the fall of 2003 and its reports are disturbing, the Merck board is also told, yes, there are these results, but there are contrary results from the following other tests, and we have ongoing clinical studies, which are the studies that ultimately resulted in the withdrawal of the drug that were going on at that time. The board was informed that those studies were going on in writing in a letter from the senior vice president, Mr. Frazier, which is also in your appendix. So what the board is being informed of here is there is a debate. There isn't, for counsel to say there was no debate, and this was dispositively proven that this drug was dangerous, when the record shows clearly that the FDA, which is locked in a very serious debate with Merck about this, over a very long period of time, the expansion applications went in two years before they ultimately were approved. So just to recount all of the things that you have been talking about or that the appellant's counsel have been talking about, the district court talked about three isolated studies and did seem to draw inferences against the plaintiff here. Should this not go back for this more in-depth review of exactly what was known and when, and a better assessment of the risk? Quite frankly, I find that what the district court did here, in light of all the facts, to be giving it short shrift. It shouldn't go back because the burden on the district court at this point, at this stage, in looking in a demand futility inquiry, is not to determine in hindsight whether the board made the right judgment. This is a classic business judgment situation. There is no case that says that the directors are not permitted to rely on the senior scientists of the corporation. The directors did rely. They were repeatedly briefed by the top scientists at this company. You will not find a single case, none has been cited to you under New Jersey or Delaware jurisprudence, that suggests that the board can't, that the board has to presume that Ed Skolnick is lying to them, that Dr. Green is lying to them, that the other Merck scientists are lying to them, or that they don't know what they're doing. At a certain point, you agree that Vioxx was pulled from the market and that the board certainly, at a certain point, knew that Vioxx should be pulled because it was causing harm. What I think the issue is between, the difference between you and the plaintiffs, is, is there a point before Vioxx was pulled when the directors had sufficient information to know that it should be pulled or that there should be further tests and they did nothing? This lawsuit was brought six months before the study that prompted the withdrawal of the drug became available. Do you agree with what I just said? No, I can't because the court, the board was not aware of that information at the time. Even when Vioxx was pulled, should the board have any, had any responsibility in knowing what should be done? No, that's not what I'm saying. Well, that's the hypothetical I gave you. I'm sorry. I'm saying, where in that time continuum should the board, or did the board, become aware of the fact that action should be taken to withdraw Vioxx? The board... Was there a period of time between that decision, or should have been decision by the board, and the time when Vioxx was actually withdrawn, that the board would have resisted any stockholder demand? The board did not learn the information that put it on notice, that led it to take the action it took until September. The study results came out in September of 2004, six months after the derivative demand was made in this case, and within days the board had acted to withdraw the drug from the market. You are saying that not until that study did the board have sufficient knowledge that Vioxx should have been withdrawn, and that they would be liable if it wasn't withdrawn, so they would resist any demand from stockholders to take action? Absolutely. I'm saying the board was not in a position to make that judgment to withdraw the drug until September of 2004, and the relevant board here is the March 2004 board, and that board was in possession of conflicting information, including repeated assurances based on studies that were presented to the board that the drug was safe, and that in comparison to tests against placebo, the drug had shown absolutely no worse, no more tendency to cause adverse cardiovascular events than placebos had. The conflicting information didn't necessarily come from the studies themselves, but rather from Dr. Green and Dr. Skolnick. Is that fairly accurate? Where did the conflicting information come from that disputed the findings of these various studies? The information was provided, the studies were presented to the board, and I'll give you the citations in the, if you look at appendix 143 to 152 in volume 2 of the appendix, that's Dr. Skolnick's presentation from the clinical trials through September 2000. In February of 2001, Dr. Green presented graphs showing the favorable cardiovascular safety data from clinical studies. That's at appendix A428 to 29. In October of 2001, after the FDA warning letter, Dr. Skolnick made another presentation to the directors. I think, Mr. Varen, that's pretty much what I was saying, that the conflicting information did not come from separate studies, but rather from Dr. Green and Dr. Skolnick. It came from studies performed by Merck scientists who were engaged in a number of tests showing the, trying to demonstrate both the effectiveness of the drug and whether the drug was safe or not. Separate tests to dispute the various other tests that I had mentioned before? The separate tests do not dispute the results of any of the studies that were shown. The tests that were presented, that were also presented to the board, were the VIGOR study, which was the comparison with naproxen, which the FDA itself said, this could mean what you say it means, it could mean that naproxen is cardioprotective, or it could mean that Vioxx is a problem. At some point, pressing Judge Roth's point, I mean, the board was faced with information that people were dying who were taking Vioxx at an unusually high rate. At that point, there had to be a point where the board said, you know, we have a problem here. We have a big problem, and we're not doing anything about it. And we may be putting ourselves at some risk. I mean, don't these studies suggest, or can't you infer that that's precisely what took place? No, you can't. What the law says is that it is not up to the board to resolve a scientific conflict when the information that the scientific data is in fact in dispute. And it was in dispute. But there was a significant risk presented to the board that there was a significant danger of the use of Vioxx. Wasn't that information presented? An unusually high percentage of people using Vioxx were suffering dangerous health hazards. No, the board was not presented with that information. As opposed to others who were not using Vioxx. The board was not presented with information showing that there were getting heart attacks from Vioxx. They were shown the results of comparative studies, most of which showed the opposite, showed that the drug was as safe or safer than placebo. Mr. Barron, let me ask you a question. In our previous opinion, we concluded with the language about the well-established link, and we said the question before the district court will be whether the additions permitted by virtue of this opinion will transform the complaint from patently conclusory to a that the March 2004 directors approved, participated in, or caused MRF. Don't we have to target at that date because we have directed that? March 2004 is absolutely the relevant measuring point for the conduct of this board of directors. And did the district court do that? Look at March 2004 directors? The district court looked at the March 2004 board and the material that was demonstrably in front of it. It did not presume, and the law doesn't authorize it to presume, that the directors have every piece of information that is in the public domain. The Pfizer decision in the Second Circuit says specifically that the court isn't supposed to presume that, nor that the board is in possession of every email that is written by employees. But isn't it troubling the district court referred to September 2000 and February 2001, never talked about any relevant later conduct. It actually was much. The board actually, the court actually refers specifically to the FDA approval of the new packaging and labeling literature that says it discloses extensively the results of the VIGAR study. And it says that the significance of that data is unexplained and the significance of it is not known. The FDA itself, after months and months and months of review, concluded that this was a currently unanswered question. If I may, you raised a question about the pending Supreme Court case on Supreme Court. The Supreme Court has granted cert to review the prior decision by the panel decision on which Judge Roth was the dissenting judge. In our view, either that decision stands, in which case it is inconceivable that there could be liability on the part of the directors, since that decision holds that all of the publicly available information, which is the very same information that plaintiff's counsel is saying, indicts the board. That they're saying all of that information wasn't enough, it wasn't, it didn't even suggest the existence of a significant debate about the safety of the drug to put investors on notice. If that decision stands, then it seems a for sure there can't possibly be a risk of liability here. But there's a different date, isn't there? The date in the Merck case on cert is the date when the stockholder should have seen the storm warnings, which is not necessarily the March 2004 date that the district court. That's true, and one would have to look at the additional information that was available to the board that based the clinical studies that came between the fall 2001 inquiry notice date and March of 2004. That's absolutely right, Your Honor. Because our issue is whether to CAV, whether to put this case on hold, because we might be doing something inconsistent with what the Supreme Court does. Anyway. Thank you, Your Honor. Thank you. Your Honors, we're told a few moments ago that the FDA really just said, well, you know, maybe naproxen isn't so bad after all, but maybe it is in the FDA warning letter. And that's absolutely not what the FDA said. And I'd just like to read, I'm reading from page 755 of the transcript, I'm sorry, of the appendix. It is at the bottom of page 3 of the FDA's letter to Merck. And the specific section that I'm reading says to Merck, there are no adequate and well-controlled studies of naproxen that support your assertion that naproxen's transient inhibition of platelet aggregation, and that's what they are saying helps, has been helping here prevent heart attacks, is far more dynamically compared to aspirin or clinically effective in decreasing the risk of myocardial infarction. Therefore, your representation that naproxen prolongs bleeding time and inhibits platelets identically to aspirin is misleading and minimizes the potential seriousness of this finding. That's not exactly what Merck is telling you today. And the law does presume that the directors are well-informed and are kept well-informed. Not only did the district court, A, find that to be the case in this case, B, was that conceded by the defendants in their brief? I think correctly so. But, C, the very business judgment rule that they seek to use as a shield in this case has as its core the presumption that the directors act in good faith and on an informed basis. Therefore, one needs to presume that Skolnick told the board, because he was a director at this time, that Skolnick and Gilmartin did act in good faith and told the board what they knew and told the board what was in their own emails and that the board was well-informed about these things. If we agree with you, Mr. Perlman, we would have to say, if I've got the answer correct, that the district court abused its discretion? Yes. In failing to allow you to amend the complaint? Yes. But I want you to give me a specific abuse of discretion. The abuse of discretion was in failing to allow us to amend the complaint where we have demonstrated, in failing to file the amended complaint where we have demonstrated precisely what the district court said we demonstrated, and that is that the directors were aware of these issues, that the directors not only did nothing to stop Merck from doing what it was doing, but affirmatively went forth with board-approved press releases which told the public something that the board reasonably knew was not true, which is You're suggesting that the district court did not fairly evaluate the information that you had presented to the district court. I'm suggesting two things. Number one, yes, that's correct. And number two, it's not to the district court to evaluate and balance back and forth. It's to the district court to determine whether we have made it over that relatively low hurdle of raising a reasonable doubt. Did it fail to do anything that it should have done? Did it overlook anything? It overlooked the great volume of studies that were before. It overlooked the great volume of evidence that was in the complaint, focused on, I think, basically trying to pick things out of two different articles that were presented by the defendants that were referred to in the complaint. Does the board have collective knowledge? Would board members who came on after September of 2001 be presumed to have knowledge of the FDA letter? Oh, yes. Something of the significance of the FDA letter, I think, absolutely. I think a board member would be completely derelict in their responsibility if in dealing with issues such as Vioxx, they were not aware of that FDA letter. That is absolutely a seminal document with respect to this and with respect to the company. Remember, this isn't just some small little thing that was producing. I hate to say some small thing that was producing a couple of million dollars a year. This was the biggest thing in Merck's piggy bank. This drug was producing over $2 billion a year in sales for Merck, and Merck was pushing and pushing and pushing to get more. This was the most important product this company had, and any well-informed director would have to be aware of what was happening with respect to this drug. It was the core of the company. All right. Thank you. This case was well argued. We'll ask you to arrange for a transcript of oral argument. If you could contact the clerk and have that done for us and split the cost, we'd appreciate it. We'll certainly do that, Your Honors. Thank you very much for your patience. Thank you.